UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


KRISTI J. CORTEZANO,                    )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )        1:09-cv-857-SEB-MJD
                                        )
SALIN BANK & TRUST CO.,                 )
                                        )
            Defendant.                  )


**ORDER GRANTING DEFENDANT=S MOTION FOR SUMMARY JUDGMENT**


      This cause is before the Court on Defendant=s Motion for Summary Judgment

[Docket No. 58], filed on July 29, 2010, pursuant to Rule 56 of the Federal Rules of Civil

Procedure and Local Rule 56.1.  Plaintiff, Kristi J. Cortezano, brings her claim against

her former employer, Defendant, Salin Bank & Trust Co. (ASalin Bank@), for its allegedly

discriminatory actions toward her based on her husband=s race (Hispanic) and nation of

origin (Mexico), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e *et seq.*  Ms. Cortezano also asserts state law claims against Salin Bank for

intentional infliction of emotional distress, blacklisting, and defamation.  For the reasons

detailed in this entry, we <u>GRANT</u> Defendant=s Motion for Summary Judgment.


**Factual Background**

      Ms. Cortezano and her husband, Javier Cortezano (AJavier@), a Mexican citizen,

were married in 2001.  Between 1997 and 2007, Javier lived in the United States as an undocumented Aillegal@ alien.  On December 25, 2007, Javier returned to Mexico for an appointment at the consulate in Ciudad Juarez to begin the process of addressing his citizenship status in order to legally return to the United States at some point in the future.  Javier has not been back to the United States since that date.

On March 26, 2007, Salin Bank hired Ms. Cortezano has a manager in training for the Ft. Wayne, Indiana, area.  She was an at-will employee and did not have a written employment agreement with the bank.  On April 23, 2007, Ms. Cortezano was promoted to Bank Sales Manager at the Southgate Banking Center.  On August 27, 2007, she was transferred to the DuPont Banking Center, where she continued to hold the position of Bank Sales Manager.  Throughout her employment with Salin Bank, Ms. Cortezano=s supervisor was Vice President Regional Sales Manager Stacy Novotny.

**Javier=s Accounts at Salin Bank**

While he was in the United States, Javier attempted to start a car detailing and repair business.  Ms. Cortezano helped him with much of the paperwork and also referred him to the Salin Bank branch that she managed in order to open a business account.  She did not personally open the account, however.  Because Javier was not in the country legally, he did not have a Social Security Number (ASSN@), but instead had an Individual Tax Identification Number (AITIN@) that was issued to him by the Internal Revenue Service on January 17, 2002.  According to Ms. Cortezano, Salin Bank allows individuals

to open accounts with ITINs and the bank was aware that Javier had an ITIN because that information was recorded on Ms. Cortezano=s employment insurance documentation.

Because Ms. Cortezano worked at Salin Bank, she and Javier decided to open the business account there.  Ms. Cortezano helped Javier obtain a federal tax identification number for the business, Cortezano Motors, Ltd.  On August 8, 2007, the business received a provisional employer identification number.  Javier opened both a business bank account for Cortezano Motors, Ltd. and a personal bank account with Salin Bank.  Ms. Cortezano and Javier also had a joint checking account with the bank.  When she was hired, Ms. Cortezano had requested that Javier=s name be added to the account.  Although she did not personally open Javier=s accounts, Ms. Cortezano told Javier what documentation was required to open the business account.  After Javier opened the business account, however, he never ran the business.  Although there were some minor transactions, the business account never contained more than $64.00.


**Plaintiff=s Vacation Request**

Near the end of 2007, Ms. Cortezano submitted a request with Ms. Novotny for time off for a two-week vacation.  Ms. Cortezano explained that Javier had previously been in the United States illegally and that she needed the time off so that she could attend court proceedings in Mexico to help Javier obtain U.S. citizenship.  Ms. Novotny=s supervisor, Vice President of Retail Banking Laura Ault, granted Ms. Cortezano=s vacation request.  After her vacation request was granted, on January 22, 2008, Ms.

3

Cortezano sent an email to her co-workers at the DuPont Banking Center, informing them how to contact her while she was in Mexico. Based on prior discussions, her co-workers were already aware of Javier=s immigration status and knew that she was trying to help him become a U.S. citizen.

Ms. Cortezano was in Mexico from Thursday, January 24, 2008, through Friday, February 8, 2008. During that time, Ms. Cortezano and Javier were interviewed by U.S. government officials at the U.S. Embassy in Ciudad Juarez, Mexico. The purpose of the interviews was to determine the validity of the marriage.

**Defendant=s Investigation Into Plaintiff=s Accounts**

On February 5, 2008, while Ms. Cortezano was in Mexico, Ms. Novotny telephoned Salin Banks=s Security Officer, Mike Hubbs, and told him that Cortezano had a husband who was residing in the United States illegally, that her husband had returned to Mexico, and that there were some problems with his re-entry back into the United States. Ms. Novotny also informed Mr. Hubbs that Ms. Cortezano shared accounts with Javier despite knowing that he was residing illegally in the United States.

Following the telephone call, Mr. Hubbs began an investigation and determined that there were in fact accounts at the bank that had been opened in Javier=s name. Mr. Hubbs testified by deposition that, because Javier was not in the country legally, these accounts raised concerns under bank fraud statutes. After confirming the existence of Javier=s accounts, Mr. Hubbs contacted Salin Bank=s senior management and scheduled a

meeting for February 11, 2008 at the bank=s Georgetown Banking Center for himself, Ms. Novotny, and Ms. Cortezano.  The purpose of the meeting was to discuss the accounts that had been opened in Javier=s name.

**The February 11, 2008 Meeting**

On February 11, 2008, Ms. Cortezano, Ms. Novotny, and Mr. Hubbs met privately in the break room of the Georgetown Banking Center to discuss Javier=s accounts.  The meeting lasted between thirty and sixty minutes.  Ms. Novotny sat in on the meeting merely as a witness and did not ask any questions.  She was present for all but approximately five minutes near the end of the meeting when she stepped out to make a telephone call.  During that time, Ms. Cortezano and Mr. Hubbs were alone.

At the meeting, Ms. Cortezano told Mr. Hubbs and Ms. Novotny that, approximately thirteen years earlier, Javier had paid $3,500 to be smuggled into the United States.  She explained that he had been living in the country illegally when she met him, but that he had recently gone back to Mexico to address his citizenship status and had been unable to return.  Ms. Cortezano indicated that she had traveled to Mexico in an attempt to procure a Visa for Javier so that he could legally reside in the United States.

Ms. Cortezano informed Mr. Hubbs and Ms. Novotny that once Javier was in the

United States illegally, he had obtained an Indiana driver=s license and an ITIN.[1]  Ms.

Cortezano further explained that she had helped Javier obtain an Employer Identification

Number (AEIN@) from the State of Indiana to secure a Registered Retail Merchant

Certificate for Cortezano Motors, Ltd.  Salin Bank employee, Bama Hollis, opened a

bank account for the business.  Although Ms. Cortezano contends that this account was

opened with proper documentation, she testified by deposition that she does not know

what documentation Ms. Hollis used to open the Cortezano Motors account.

   According to Ms. Cortezano, when she was alone with Mr. Hubbs near the end of

the meeting, he began to scream at her, yelling that Javier got his driver=s license and

ITIN under Afalse pretenses,@ that Javier was Aa piece of shit@ and Aa piece of garbage@

because he was in the country illegally, and that she was breaking the law.[2]  Ms.

Cortezano also testified in her deposition that for approximately five seconds Mr. Hubbs

Agot in [her] face,@ meaning that he put his face about six to twelve inches away from

hers.  Ms. Cortezano contends that Mr. Hubbs demanded that she admit that she had

---

[1] It is not clear from the record which documents Javier used to procure his ITIN.  In her
deposition, Ms. Cortezano testified inconsistently as to this issue.  At one point during her
deposition testimony, Ms. Cortezano averred that Javier used his Mexican passport, Mexican
birth certificate, a bill, and his ITIN to obtain his Indiana driver's license.  Cortezano Dep. at
108.  However, Ms. Cortezano subsequently testified at her deposition that Javier provided his
Indiana driver's license as an identification document to the IRS to obtain his ITIN.  Id. at 109.
Later in her deposition, Ms. Cortezano testified that she did not know if Javier provided a copy
of his driver's license to the IRS to obtain Javier's ITIN.  Id. at 133-34.

[2] Mr. Hubbs testified by deposition that, at the February 11 meeting, it was Ms. Cortezano who
told him that, when she married Javier, she helped him purchase a fraudulent Social Security
card, which then allowed him to obtain an Indiana driver's license and an ITIN and/or a TIN
under false pretenses.  Hubbs Dep. at 12, 17.

helped Javier "illegally" procure his driver=s license and ITIN number and had opened the bank accounts, and also instructed her to provide paperwork regarding Javier=s ITIN and EIN for the business. Finally, Ms. Cortezano contends that Mr. Hubbs stated that a bank account could not be opened with an ITIN and that he would be filing a Suspicious Activity Report against her and Javier because they had opened the accounts without proper documentation.

The information gathered at the February 11 meeting was subsequently forwarded to Salin Bank=s Human Resources Department.

**Communications Following the February 11 Meeting**

On February 12, 2008, Ms. Cortezano emailed Ms. Novotny and Mr. Hubbs to inquire about the documents which can be used to acquire an ITIN that Mr. Hobbs required her to produce.[3] Ms. Novotny told her to send "whatever she had." Pl.'s Exh. 11. Ms. Cortezano provided Salin Bank with seven years of tax returns, Javier=s EIN information, business information, and various other personal documents to which she had access. After Salin Bank received the documents, Ms. Novotny contacted Ms. Cortezano to schedule a follow-up meeting for Cortezano, Novotny, Hubbs, and Ms. Ault, the Vice President of Retail Banking for February 19, 2008.

---

[3] In that email, Ms. Cortezano stated that her husband was in possession of the following documents: (1) foreign driver's license; (2) U.S. driver's license; (3) "foreign voters card"; (4) Mexican passport; (5) "civil birth certificate"; and (6) "foreign military card." She further stated that, although she did not know which of these documents Javier used to procure an ITIN number, it was some combination thereof.

After receiving Ms. Cortezano's February 12 email discussing the documentation

Javier had in his possession, Mr. Hubbs sent an email to Ms. Novotny, Ms. Ault and two

other bank employees in which he stated as follows:

> It is important to note that TINS (tax identification numbers) are issued to foreign nationals working and residing in the US legally. This does not apply to [Ms. Cortezano's] husband. He gained entry into the US illegally about 13 years ago paying $3500. Although he did obtain a valid TIN and EIN, he is not authorized by both state and federal law to do so. He was able to obtain the identification because he had illegally obtained an Indiana DL by providing an unknown amount of false identification.
>
> An foreign national under federal immigration laws must:
>
> 1. Be in the US legally
> 2. If gaining lawful employment obtain a US VISA work permit
> 3. Not claim the TIN as an identification number
>
> Tim [Hogan] and Laura [Ault] let me know if you have time today to meet and discuss this.

Pl.'s Exh. 11.

The next day, on February 13, 2008, Ms. Novotny wrote a termination notice

addressed to Ms. Cortezano, which stated in pertinent part as follows:

> Throughout your employment, you have maintained a DDA account with Salin Bank and Trust Company where the co-signer has provided a Tax Identification Number (TIN) that was obtained by using false documentation. You were aware of the fraudulent information being provided to the bank and allowed the individual to join your account. . . . This act of fraud reflects negatively on you <u>and</u> Salin Bank and has caused irreparable harm to the employment relationship. This is a violation of the Bank's established Professional Conduct policy . . . .

Pl.'s Exh. 21 (emphasis in original). This memorandum was never signed by Ms.

Novotny nor sent to Ms. Cortezano, however.

**February 19, 2008 Meeting**

On February 19, 2008, Ms. Cortezano brought her attorney at the time, John E. Williams, Jr., with her to the scheduled meeting which was held at the Bank=s downtown location in Fort Wayne, Indiana. When Ms. Cortezano and Mr. Williams arrived, Ms. Novotny and Mr. Hubbs asked to speak privately with Ms. Cortezano, without her attorney present. Mr. Williams responded that he would be joining the meeting. When the bank representatives explained that the meeting pertained to a private bank matter and refused to allow Mr. Williams to attend, upon consulting with Williams, Ms. Cortezano stated that she would not meet with Salin Bank=s representatives without her attorney present.

As Ms. Cortezano and her attorney prepared to leave, Ms. Ault inquired whether their departure meant that Ms. Cortezano was walking away from her role and abandoning her job. Ms. Cortezano did not respond, but merely left the meeting. The February 19 meeting lasted approximately five minutes, due to Ms. Cortezano=s exit.

**Plaintiff=s Termination**

Shortly after Ms. Cortezano left the February 19 meeting, Ms. Novotny telephoned Human Resource Specialist Ami Anderson, explained the situation, and recommended that Ms. Cortezano be terminated based on her decision not to participate in the meeting without her attorney. Ms. Anderson prepared a termination letter dated February 19,

2008, which stated in relevant part: AThis morning you made the decision to leave and not participate in the discussion concerning your employment with Salin Bank & Trust Co. At this point, the decision has been made to terminate your employment effective today." Pl.'s Exh. 22.

After composing the termination letter, Ms. Anderson contacted Michael Blickman, who was then serving as Salin Bank=s counsel, and Ms. Ault. Ms. Anderson provided Ms. Ault with the termination letter and Ms. Ault in turn spoke with Executive Vice President of Operations Tim Hogan about the situation. Mr. Hogan ultimately approved Ms. Cortezano=s termination. After Mr. Hogan approved the termination letter, Ms. Anderson implemented standard termination procedures, mailed the termination letter, and notified payroll. On February 21, 2008, Ms. Cortezano received the termination letter which was signed by Ms. Novotny and dated February 19, 2008, the effective date of her (Cortezano=s) termination.

**The Instant Litigation**

On September 11, 2008, Ms. Cortezano filed suit against Salin Bank in the Marion Superior Court, alleging state law claims for intentional infliction of emotional distress, blacklisting, and defamation. Thereafter, on June 25, 2009, Ms. Cortezano filed an Amended Complaint and added a Title VII claim. Salin Bank removed the action to this Court on July 10, 2009.

## Legal Analysis

### I.     Standard of Review

Summary judgment is appropriate when the record shows that there is Ano genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.@ Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  <u>See id.</u> at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ <u>id.</u>, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party Abears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.@ <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ Celotex, 477 U.S. at 323.

A plaintiff=s self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O=Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that

end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).


## II.    Title VII

Salin Bank first argues that Ms. Cortezano cannot recover under Title VII because she alleges that she was discriminated against, not because of *her* own race, but because she is married to an Hispanic man of Mexican descent. The Seventh Circuit has not yet ruled on the question of whether Title VII applies in such circumstances. See Ineichen v. Ameritech, 410 F.3d 956 (7th Cir. 2005) ("This court has not yet definitely ruled on whether discriminating against a person because they are involved in an interracial relationship constitutes race discrimination in violation of Title VII . . . ."). However, the Second, Fifth, Sixth, and Eleventh Circuits have all held that the statute is applicable in such situations. See Holcomb v. Iona College, 521 F.3d 130 (2d Cir. 2008) (holding that "an employer may violate Title VII if it takes action against an employee because of the employee=s association with a person of another race"); Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick and GMC Trucks, Inc., 173 F.3d 988, 994 (6th Cir. 1999) (holding that a white employee may sue for race discrimination under Title VII where he alleges

13

he was fired for having a biracial child); <u>Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 156 F.3d 581, 588-89 (5th Cir. 1998), <u>reinstated in relevant part on reh=g en banc</u>, <u>Williams v. Wal-Mart Stores, Inc.</u>, 182 F.3d 333 (5th Cir. 1999) (per curiam) (holding ATitle VII prohibits discrimination in employment premised on an interracial relationship@); <u>Parr v. Woodmen of the World Life Ins. Co.</u>, 791 F.2d 888, 891-92 (11th Cir. 1986) (AWhere a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.@) (emphasis in original).

We need not make a definitive determination on this issue, however, because we find that Ms. Cortezano's Title VII claim fails for an entirely separate reason. Accordingly, for purposes of deciding this motion, we will assume that Title VII is applicable in the situation at bar and proceed to address the merits of Ms. Cortezano's claim.

A plaintiff may prove discrimination under Title VII Aeither by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the <u>McDonnell Douglas</u> formula.=@ <u>Rudin v. Lincoln Land Community College</u>, 420 F.3d 712, 719 (7th Cir. 2005) (quoting <u>Sheehan v. Daily Racing Form, Inc.</u>, 104 F.3d 940, 940 (7th Cir. 1997); <u>see</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Ms. Cortezano did not address the <u>McDonnell Douglas</u> method in her briefing in opposition to this motion, so we follow her lead and analyze only whether she has put forth sufficient evidence of discriminatory

motivation to survive summary judgment.

This method of proving race discrimination is often called the Adirect@ method. Rudin, 420 F.3d at 720 (citing Sheehan, 104 F.3d at 941). A plaintiff proceeding under the direct method may rely on Aeither direct evidence that acknowledges discriminatory animus on the part of the employer or circumstantial evidence which establishes discriminatory motive through a longer chain of inferences.@ Grigsby v. LaHood, 628 F.3d 354, 358 (7th Cir. 2010) (citing Mach v. Will County Sheriff, 580 F.3d 495, 499 (7th Cir. 2009)). Because direct evidence consists of an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus, such evidence is "understandably rare." Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009). Ms. Cortezano has presented no evidence of any such admissions here, and thus, we need only address whether she has presented sufficient circumstantial evidence of discrimination to survive summary judgment.[4]

The Seventh Circuit has recognized three types of circumstantial evidence of intentional discrimination. Hossack v. Floor Covering Assocs. of Joliet, Inc., 492 F.3d 853, 862 (7th Cir. 2007). The first and most common type of circumstantial evidence

---

[4] From the parties' submissions, it appears that there is some confusion between the direct method of proof and direct evidence of discrimination. Although Ms. Cortezano has not presented direct evidence of discrimination, this does not mean that she must proceed via the indirect method of proof as Defendant appears to believe. The "use of direct evidence is merely one of two means (the other being the use of circumstantial evidence) of proceeding under the direct method." Rogers v. City of Chicago, 320 F.3d 748, 754 (7th Cir. 2003) (citations omitted). Because Ms. Cortezano has neither presented direct evidence of discrimination nor attempted to make a prima facie case of discrimination under the McDonnell Douglas framework, we need only address whether she has presented sufficient circumstantial evidence of discriminatory animus to create a triable issue.

Aconsists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn . . . .@ Id. (quoting Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).  The second type consists of evidence that similarly situated employees outside of the protected class received systematically better treatment.  Id.  The third type is Apretext evidence, where the plaintiff is qualified for and fails to receive the desired treatment, and the employer=s stated reason for the difference is unworthy of belief.@ Piraino v. Int=l Orientation Resources, Inc., 84 F.3d 270, 274 (7th Cir. 1996) (citing Troupe, 20 F.3d at 736).  However, whatever circumstantial evidence is presented "must 'point directly to a discriminatory reason for the employer's action.'" Van Antwerp v. City of Peoria, Ill., 627 F.3d 295, 298 (7th Cir. 2010) (quoting Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)).

Although it is not made completely clear in her briefing, it appears that Ms. Cortezano is utilizing the third category of circumstantial evidence, to wit, evidence of pretext.  Ms. Cortezano argues that, although the Bank ostensibly terminated her for failing to participate in the February 19 meeting concerning her employment, there is sufficient evidence in the record from which a jury could conclude that she would have been fired regardless of whether she had participated in that meeting, merely because of her husband's nationality and the fact that he had "an ITIN rather than an SSN."  Pl.'s Resp. at 17.  In support of the argument that the Bank's proffered reason was not the true

reason for her termination, she points to the undelivered February 13, 2008 memorandum prepared by Ms. Novotny, which states that the Bank was terminating Cortezano because she knowingly maintained an account with a co-signer who had provided an ITIN that was fraudulently obtained. Ms. Cortezano also points to the fact that, although Mr. Hubbs did not make the decision to terminate her, he was the primary individual responsible for investigating the situation, and, according to Cortezano, he made numerous statements critical of Javier, including calling him "garbage because he's illegal" and stating that he "was a piece of shit and fraudulently making [Cortezano] open accounts at the bank." Cortezano Dep. at 104, 106.

We are not persuaded that Ms. Cortezano has proffered sufficient evidence to allow a jury to find that Salin Bank's legitimate reason for terminating her was a pretext for discrimination. To establish pretext, a plaintiff must show that her employer's reason for terminating her "was a lie – not just an error, oddity or oversight." Van Antwerp, 627 F.3d at 298 (citations omitted). Moreover, "even if the business decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason." Stockwell v. City of Harvey, 597 F.3d 895, 902 (7th Cir. 2010) (citing Little v. Illinois Dep't of Revenue, 369 F.3d 1007, 1012 (7th Cir. 2004)). Thus, in order to show pretext "'a plaintiff must show that (a) the employer's non-discriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent.'" Perez v. Illinois, 488 F.3d 773, 777 (7th Cir. 2007) (quoting E.E.O.C. v. Target Corp., 460 F.3d 946, 960 (7th Cir. 2006)).

Salin Bank does not deny that it originally intended to terminate Ms. Cortezano for the reason specified in the February 13 letter prepared by Ms. Novotny, to wit, because the Bank believed that she (Cortezano) had helped Javier open accounts with knowledge that that he had acquired his ITIN by using false documentation. However, it asserts that, when Ms. Cortezano left the February 19 meeting without discussing her employment with the Bank, it instead decided to terminate her for that intervening action. Salin Bank argues that Ms. Cortezano cannot establish pretext because, ultimately, the only stated reason for her termination – her refusal to participate in the February 19 meeting – is both honest and nondiscriminatory. We agree. Had the Bank made a final decision to terminate Ms. Cortezano on February 13, when the initial termination memorandum was written, it is reasonable to assume that it would have sent notice to Cortezano either on or near that date. Yet there is no dispute that the February 13 letter was never signed by Novotny nor ever sent to Cortezano. Additionally, Ms. Cortezano admits that her refusal to meet on February 19 "was the last act [she] had as a Salin Bank employee." Pl.'s Resp. at 10. These facts support the conclusion that the Bank did not ultimately decide to terminate Ms. Cortezano's employment until she failed to participate in the February 19 meeting.

We cannot find the fact that Salin Bank concedes that it originally intended to terminate Ms. Cortezano because it believed she had helped Javier open accounts with an ITIN she knew had been procured using false documentation sufficient to establish pretext. We are persuaded by the Bank's argument that the February 13 letter does

nothing more than establish that it had an "alternative, legitimate and non-discriminatory basis for terminating Cortezano's employment." Def.'s Reply at 10. The February 13 letter does not, as Ms. Cortezano appears to argue, state that Cortezano was being fired solely because she had helped her husband open a bank account with an ITIN rather than a Social Security Number, (which arguably could raise an inference of discrimination as it appears that using an ITIN is an acceptable method of opening an account), but rather that Ms. Cortezano had helped him open accounts using an ITIN *that she knew had been obtained by providing false documentation.* See Pl.'s Exh. 21.

Ms. Cortezano maintains that Javier did not obtain his ITIN in a fraudulent manner. However, even if true, it is irrelevant to our analysis because the relevant question in a pretext inquiry "is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418 (7th Cir. 2006) (emphasis in original). Plaintiff has failed to point us to any evidence in the record establishing that Salin Bank did not honestly believe that Ms. Cortezano had helped Javier open bank accounts despite having knowledge that he had an ITIN that had been obtained by using false documentation. Because bank employees are tasked with many duties requiring the handling of customers' sensitive financial and other confidential indentifying information, a bank must have the utmost level of trust in those it employs. There is insufficient evidence in the record from which a jury could conclude that it was

discriminatory intent[5] as opposed to this nondiscriminatory, entirely reasonable concern

that motivated the Bank's decision to terminate Ms. Cortezano.  Accordingly, we

GRANT Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim.


## II.    State Law Claims

For the reasons detailed above, we have determined that summary judgment is

appropriate on Ms. Cortezano's sole federal claim.  Jurisdiction in this court exists only

under federal question jurisdiction and not diversity jurisdiction, and thus, the court has

no independent jurisdictional basis over the state law claims that remain in this action.  A

court may, under such circumstances, decline to exercise supplemental jurisdiction over

pendent state law claims.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to

exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district

court has dismissed all claims over which it has original jurisdiction.").

A district court exercises significant discretion in determining whether to remand

such pendent claims, based upon "the principles of economy, convenience, fairness, and

comity which underlie the pendent jurisdiction doctrine."  Carnegie-Mellon University v.

---

[5] Even assuming, as we are required to do at this stage in the litigation, that Mr. Hubbs did in fact
make derogatory statements about Ms. Cortezano's husband at the February 11 meeting, it
appears from Cortezano's deposition testimony that Hubbs made those statements, not because
of Javier's race or national origin, but rather because Hubb's believed that Javier "was doing
things fraudulently" and had used "false pretenses" to procure a driver's license as an illegal
alien.  Cortezano Dep. at 104-05.  Moreover, Mr. Hubbs did not make the decision to terminate
Ms. Cortezano.  Accordingly, whatever comments Mr. Hubbs may have made do not affect our
pretext analysis.  See Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 789 (7th Cir.
2004) ("Nor are we any more convinced . . . that actions and statements by non-decisionmakers
reveal the pretextual nature of [the defendant's] decision.") (internal quotations omitted).

Cohill, 484 U.S. 343, 357 (1988). Under Seventh Circuit law, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998) (quotations omitted). However, there are three recognized exceptions to this general rule when: (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"; or (3) "when it is absolutely clear how the pendent claims can be decided." Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) (internal quotations and citations omitted). Because, for the reasons detailed below, we find that it is absolutely clear that Ms. Cortezano's state law claims should be dismissed, we will exercise supplemental jurisdiction over the pendent claims and proceed to address them.


A.      Intentional Infliction of Emotional Distress

Under Indiana law, the elements of a claim of intentional infliction of emotional distress are: (1) extreme or outrageous conduct by the defendant; (2) which intentionally or recklessly; (3) causes; (4) severe emotional distress to another. Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991). These elements of proof for a claim of intentional infliction of emotional distress are rigorously applied and Indiana courts have only found liability Awhere the conduct has been so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.@ Bradley v. Hall, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts ' 46, cmt. D).

Here, Ms. Cortezano's allegations regarding her emotional distress claim are as follows: Mr. Hubbs privately confronted her regarding Javier=s bank accounts, called Javier various derogatory names, and Agot in [her] face@ for approximately five seconds while yelling at her. Assuming as we are required to do at this stage in the litigation that Mr. Hubbs behaved in the manner alleged by Ms. Cortezano, it nonetheless appears to have been an isolated incident which took place outside the presence of others and involved no prolonged harassment. Although we obviously do not condone such behavior or insults, Mr. Hubbs=s alleged actions do not rise to the level required to impose liability for intentional infliction of emotional distress under Indiana law. Cf. McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1166-67 (7th Cir. 1998) (upholding district court=s grant of summary judgment on intentional infliction of emotional distress claim where supervisor yelled, swore, and pointed his finger in the face of employee) (applying Indiana law). Thus, Defendant's Motion for Summary Judgment as to Plaintiff's claim brought pursuant to Indiana law for intentional infliction of emotional distress is GRANTED.


**B.      Blacklisting and Defamation**

Salin Bank is a part of the Fraud Financial Network, a loose affiliation of banks in

Northwest Indiana that was formed to allow the participant banks to share information regarding crimes and fraudulent activity in the area that could affect the member financial institutions.  In support of her claims for blacklisting and defamation, Ms. Cortezano submitted an email from Lori Markinton, a Flagstar Bank employee, which allegedly contains an excerpt of the minutes from a June 4, 2008 meeting of the Fraud Financial Network.  Item 7 of the excerpt reads as follows: "Salin warned of a bank manager, Kristi Cortezano, they fired; she had been opening up fraudulent accounts for her husband (an illegal immigrant who is now back in Mexico)."  Pl.'s Exh. 14.

Salin Bank contends that these minutes cannot be considered at the summary judgment stage because they are nothing more than inadmissible hearsay.  It is well-established under Seventh Circuit law that the evidence relied upon by the party opposing summary judgment must be competent evidence of a type otherwise admissible at trial. "Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment."  Bombard v. Ft. Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996) (citing Wigod v. Chicago Mercantile Exch., 981 F.2d 1510, 1518-19 (7th Cir. 1992)).  Although Ms. Cortezano claims that she received these notes in an email from Ms. Markinton and that they are the minutes from a meeting of the Fraud Financial Network, there is no indication of who prepared these notes, when they were prepared, or whether they were taken in the normal course of business.  This evidence is thus inadmissible hearsay as Ms. Cortezano is attempting to use it to prove the truth of the matter asserted and has not established that it falls into any of the

recognized hearsay exceptions.

Because Ms. Cortezano has failed to present any evidence other than this inadmissible hearsay in support of her blacklisting and defamation claims, these claims must be dismissed. Accordingly, we <u>GRANT</u> Defendant's Motion for Summary Judgment as to Ms. Cortezano's blacklisting and defamation claims brought under state law.

**III.     Conclusion**

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment in its entirety. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:     02/15/2011

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Christopher Kenneth Starkey
starkeyck@msn.com

Dana Eugene Stuzman
HALL RENDER KILLIAN HEATH & LYMAN
dstutzman@hallrender.com

Stephen W. Lyman
HALL RENDER KILLIAN HEATH & LYMAN
slyman@hallrender.com